**UNITED STATES DISTRICT COURT**
**SOUTHER DISTRICT OF NEW YORK**

| | |
|---|---|
| MARGO COHEN RISTORUCCI<br><br>                    Plaintiff,<br><br>        -against-<br><br><br>THE CITY OF NEW YORK; NYPD MEMBER JOAO ROSERO; NYPD MEMBERS JOHN AND JANE DOES 1-6,<br><br>                    Defendant(s) | Case No.<br><br> **COMPLAINT**<br><br><br><br><br>**PLAINTIFF DEMANDS A TRIAL BY JURY** |

Plaintiff, Margo Cohen Ristorucci by and through her attorneys, The Aboushi Law Firm, PLLC, and Leena M. Widdi, alleges as follows:

## PRELIMINARY STATEMENT

On April 30, 2024, Plaintiff Margo Cohen Ristorucci (Ms. Cohen Ristorucci) was participating in a protest against Israel's genocide of Palestinians in Gaza when police violently assaulted her, arrested her, and later falsely and maliciously prosecuted her. This lawsuit seeks justice for and accountability around the City of New York's – and its police force's – retaliatory, disproportionate, and unreasonable response to that protest and to First Amendment Activities. On the heels of a settlement promising sweeping changes to police tactics related to policing demonstrations arising from the use of excessive force and other abusive tactics during the Black Lives Matter protests in the summer of 2020 and in 2021, the NYPD has continued to engage in actions related to policing pro-Palestine demonstrations such as the one at which Plaintiffs were arrested, violating Plaintiffs' constitutional and other rights.

## JURISDICTION, VENUE, AND GENERAL MUNICIPAL LAW COMPLIANCE

1.  This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

2.  The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

3.  The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Plaintiff the declaratory and injunctive relief she prays for herein.

4.  An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

5.  Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

6.  Plaintiff timely served a Notice of Claim on the municipal Defendant and complied with all conditions precedent to commencing an action under state law.

7.  Plaintiff has initiated this action within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York State Law.

## PARTIES

8.  At all times mentioned herein, Plaintiff Margo Cohen Ristorucci is and has been a resident of Kings County in the City and State of New York.

9.  At all relevant times mentioned herein, Defendant, City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by the virtue of

the laws of the State of New York and acts by and through its agencies, employees, and agents, including (but not limited to) the New York City Police Department ("NYPD") and their employees.

10. Defendant NYPD Officer Joao F. Rosero, Tax ID# 949577, was at all times relevant to this Complaint a member of the NYPD assigned as the "arresting officer" described herein. He is sued individually and in his official capacity.

11. The true names of Defendant John/Jane Does #1-6, as noted throughout this complaint, are currently unknown to Plaintiff, except as follows: Officer John Doe #1, one of the officers who assaulted Ms. Cohen Ristorucci, appeared to a middle-aged East Asian man with short hair.

12. At all times hereinafter mentioned, the Defendants were employed by the City of New York as members of the NYPD.

13. At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

14. Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

15. Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

16. Defendants were each and all responsible, in whole and/or in part, for the planning for

and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

17.   At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

18.   Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no point did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

19.   Each individual Defendant is sued in her or his individual and official capacities.

## **STATEMENT OF FACTS**

20.   Plaintiff Margo Cohen Ristorucci is a born and raised New Yorker of Jewish and Puerto-Rican decent.

21.   On the evening of April 30, 2024, Ms. Cohen Ristorucci was attending a play with her mother when she learned of the request for street medics at and around the campus of the City College of New York, where police had employed pepper spray against pro-Palestine protestors.

22.   Ms. Cohen Ristorucci is a volunteer street medic who has received basic first aid training specifically focused on protest-related injuries and situations.

23.   Minutes after Ms. Cohen Ristorucci arrived at the protest, at the intersection of 139th Street

and Amsterdam Avenue, she found herself surrounded by what appeared to be hundreds of uniformed NYPD officers.

24.    Ms. Cohen Ristorucci was standing on the sidewalk when suddenly, without warning or cause, she was violently thrown to the ground by Officer JOAO Rosario and John Doe #1.

25.    Defendant JOAO Rosero and John Does #1-3, grabbed Ms. Cohen Ristorucci by the neck, threw her face down onto the pavement, and put their knees into Ms. Cohen Ristorucci's back.

26.    For several minutes, Defendant officers pressed their knees into Ms. Cohen Ristorucci's back while they placed zipties around Ms. Cohen Ristorucci's wrists.

27.    NYPD Officer JOAO Rosero then took Ms. Cohen Ristorucci into an NYPD van, where she remained for approximately one to two hours.

28.    Eventually, Defendant JOAO Rosero took Ms. Cohen Ristorucci to the Mass Arrest Processing Center at 1 Police Plaza.

29.    While at 1 Police Plaza, NYPD Officers subjected Ms. Cohen Ristorucci to extensive processing time, during which she was forced to stand for several hours while restrained in zip ties.

30.    During that time, Ms. Ristorruci-Cohen informed Defendant Officer JOAO Rosero that was feeling nauseous and dizzy and that she felt she might lose consciousness. Ms. Cohen Ristorucci told Officer Rosero that she needed somewhere to sit.

31.    Despite Ms. Cohen Ristorucci's repeated pleas for medical care, Defendants failed to provide her with any medical care, attention, or accommodations.

32.    Ms. Cohen Ristorucci also repeatedly asked NYPD officer JOAO Rosero for access to a bathroom during the several hours she was being processed, and before being placed in a

cell. Ms. Cohen Ristorucci was forced to wait many hours until she was placed in a cell for access to a bathroom.

33.    Because Defendants had arrested Ms. Cohen Ristorucci at a protest, NYPD members subjected Ms. Cohen Ristorucci to an unreasonable and lengthy large-scale arrest process.

34.    Defendant JOAO Rosero and Officer Jane Doe 4 and Jane Doe 5 unlawfully searched Ms. Cohen Ristorucci's person.

35.    Ms. Cohen Ristorucci was forced to endure the zipties for approximately four to five hours before she was brought to a holding cell and her zipties were removed.

36.    At approximately 4 a.m., the following day, Officer JOAO Rosero issued a C-Summons to Ms. Cohen Ristorucci and released her from custody. The C-Summonses (Summons Nos. 4444949593) charged Ms. Cohen Ristorucci with violating New York Penal Law 240.20(6).

37.    The summons listed Defendant Officer JOAO Rosero as the "arresting officer."

38.    Upon Ms. Cohen Ristorucci's release, she felt sharp pain in her neck, lightheadedness, dizziness and nausea.

39.    Upon information and belief, this summons relied on fabricated evidence about purported observations of Ms. Cohen Ristorucci's alleged pre-arrest conduct.

40.    The resulting criminal proceedings against Ms. Cohen Ristorucci was dismissed in the interest of justice on May 20, 2024, upon Ms. Cohen Ristorucci's completion of a Know Your Rights training.

41.    That same afternoon, Ms. Cohen Ristorucci went to the Emergency Room, due to severe neck pain, nausea, disorientation, and head pain.

42.     Ms. Ristorucci was diagnosed with a concussion.

43.     Since the Defendants' assault and arrest of Ms. Cohen Ristorucci, she has difficulty finding words, short-term and long-term memory lapses, excess fatigue, intense head pain, inability to sleep, and neck pain.

44.     Ms. Cohen Ristorucci further suffers from abnormalities in the periventricular area of her brain, and evidence of white matter—neither of which existed prior to the assault at the hands of the Defendants.

45.     Ms. Cohen Ristorucci continues to suffer from significant neck and head pain daily, along with substantial neurological symptoms that impact almost every aspect of her life, including her academic, personal, and work life.

46.     Ms. Cohen Ristorucci has also had to seek modifications of her tasks at work and to delay further applications to doctoral programs because she has struggled to read or sustain attention since the incident.

### THE NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE AND OTHER, SIMILAR DEMONSTRATIONS

47.     The NYPD's violent response to the pro-Palestine protest that the plaintiffs participated in was dramatically different from their response to other kinds of protests and rallies.

48.     On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[1]

49.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge,

---

[1] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights

Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[2]

50.    In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[3]

51.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[4]

52.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted

---

[2] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge
[3] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks- beat-dissenters-over-covid-lockdown.
[4] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her, and police threw her to the ground.[5]

53.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[6][7]

54.    In fact, on the same date and at the same location as the arrest of the Plaintiffs, individuals associated with the Red Rose Rescue, a group identified by the New York State Attorney General as a "Militant Anti-Abortion Group" that invades clinics and blocks access to reproductive health, were also present at participating in the march and protest activity.[8]

55.    However, on the date of the Plaintiffs' arrests the NYPD acted in a manner favoring those associated with the Red Rose Rescue group and treated them more favorably than they treated Plaintiffs.

56.    The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.  By way of non-exhaustive example:

---

[5] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[6] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[9] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid- orders-once-again/2762850/

[8] https://ag.ny.gov/press-release/2023/attorney-general-james-sues-militant-anti-abortion-group-invading-clinics-and , NYSAG announcing a lawsuit being filed against the Red Rose Rescue seeking to bar them from coming within 30 feet of any reproductive health care facility in New York State

    a.   In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

    b.   In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[9] [10]

    c.   More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[11] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[12]

## THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS

57.   The extensive deprivations of constitutional rights suffered by Plaintiff here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, inter alia, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National

---

[9] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson
[10] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/
[11] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud- boys-following-beatings-caught-on-video
[12] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

58.   The NYPD response to the pro-Palestine protest on April 30, 2024 was in line with  its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

59.   For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, and use of pepper spray.[13]

60.   The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests, and excessive and unreasonable detention.[14]

61.   The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[15]

62.   Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers.[16]

63.   Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, pro-Palestine and other, similar protests, over the intervening

---

[13] *See,* e.g., N.Y. Civil Liberties Union, Arresting Protest (2003), available at https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[14] *See,* e.g., N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[15] *See,* e.g., Callaghan v. City of New York, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[16] *See* People of the State of New York v. City of New York et al., 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

years.

64.    Following NYPD conduct during these and other protests, the City of New York and the

NYPD and its members have been sued repeatedly by protestors who alleged that they had

been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and

prolonger detentions and violations of their First Amendment and other, related rights,

much in the same manner as has the Plaintiff in this case.

65.    In many of these cases Defendants employed tactics developed and modified over the

course of many years by former Commissioner Shea, former Chief Monahan, and their

predecessors and by other defendant City policymakers at and in connection with other

demonstrations in the City dating back to around 2000 and continuing through the present,

including the policies, practices, and customs complained of herein, and also described and

litigated in the following cases, the most recent of which was filed in January of this year:

   a. *Moussa et al. v. City of New York,* 1:25-cv-00442 (S.D.N.Y. March 15,
      2025) (lawsuit arising from October 21, 2023 pro-Palestine alleging, *inter
      alia*, that members of the NYPD engaged in policing motivated at least in
      part by discrimination against Arab, Palestinian, Pro-Palestinian, and
      Muslim protestors protesting in support of Palestine; that members of the
      NYPD kettled, violently assaulted, and falsely arrested protestors as a
      pretext to disrupt and ultimately end the protest).
   b. *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789
      (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over
      200 demonstrators during 2002 WEF in New York City challenging, *inter
      alia*, (1) NYPD policy of detaining perceived protesters who were otherwise
      eligible to be released earlier with DATs for excessive periods of time and
      denying them consideration for DAT release on the grounds of their
      perceived participation in protests and (2) policy and practice of using plastic
      flex cuffs as unreasonable and excessive because of the manner in which
      the handcuffs were applied and the length of time for plaintiffs were
      handcuffed);
   c. *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006)
      (challenging mass arrests made in February 2002 related to the WEF
      alleging, *inter alia*, that the protestors remained on the sidewalk, walking
      two abreast and followed all rules of protesting, yet Executive Officers
      arrested them and "the police deliberately held [protesters] in custody for

an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.  *Haus v. City of New York*, 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." See also *Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.  *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as using extremely tight plastic handcuffs in their arrest;

f.  *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz*, 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04- cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims); which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions; and *Packard et al v. City of New York*, 15-cv-7130 (SDNY(AT)(SDA) that settled for a total payout including attorney fees of $980,000, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions.

**THE NYPD'S POLICY AND/OR PRACTICE OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS**

66.    Defendants used types and levels of force that were excessive and unnecessary force against Plaintiff.

67.    The uses of force against Plaintiff were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

68.    However, that use of force was consistent with and ratified within the unwritten policies of the NYPD.

69.    In "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," an October 1, 2015 report published by the New York City Department of Investigation Office of the Inspector General for the NYPD ("OIG-NYPD")[17], the OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies, including, *inter alia*, that:

    a.    NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;
    b.    NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;
    c.    NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;
    d.    NYPD training does not adequately focus on de-escalation; and
    e.    In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force. OIG-NYPD Report at pp. 3-5.

70.    After October 1, 2015, the NYPD revised its Patrol Guide provisions, and designed, created, and implemented training, to include "updated definitions concerning force, new policies

---

[17] "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," New York City Department of Investigation, Office of the Inspector General for the NYPD (October 1, 2015), *available at* http://www1.nyc.gov/site/oignypd/reports/reports.page ("OIG-NYPD Report") (last accessed April 1, 2022).

regarding de-escalation, responsibilities of witness officers in use of force incidents, reporting obligations concerning force incidents, and data analysis on use of force incidents". *See* OIG- NYPD Report at p. 2 *et seq*.; *see also* NYPD Patrol Guide Section 221-01[18] ("Force Guidelines") and 221-02[19] ("Use of Force"), issued and effective June 27, 2016 (implementing changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

71.    Under those revised NYPD written policies and procedures, NYPD members who use force are required to file written Threat, Resistance, and Injury ("TRI") reports when they use certain force, including, but not limited to, hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), and/or force that causes physical injuries, including bruising or swelling and the like. And supervisors are also required to conduct investigations and fill out TRI reports related to such uses of force.[20]

72.    Upon information and belief, Defendants failed to document, and/or require that fellow Defendants and/or other fellow NYPD members document and failed to investigate and/or supervise fellow NYPD members regarding, uses of force in accordance with related NYPD policies and/or training.

73.    Defendants used force that they knew, or should have known, would negatively impact Plaintiff, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether these uses of force were necessary,

---

[18] Available online via the New York City Civilian Complaint Review Board ("CCRB") website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-01-force-guidelines.pdf.

[19] Available online via the New York City Civilian Complaint Review Board website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-02-use-of-force.pdf.

[20] "Use of Force: Revised NYPD Policy," NYPD Use of Force Update- June 2016 (June 2016), at pp. 4-5, *available at* https://www.prisonlegalnews.org/media/publications/Use%20of%20Force%20-%20Revised%20NYPD%20Policy%20Booklet,%20NYPD,%202016.pdf ("NYPD Use of Force Update") (last accessed April 1, 2022) (footnotes omitted).

justified, or reasonable under these circumstances.

**NYPD'S VIOLENT RESPONSE TO POLICING PROTEST IN 2020**

74.   Protests against police violence erupted across the nation after the May 25, 2020 police killing of George Floyd, and there were loud demands for police accountability and support for the Black Lives Matter movement.

75.   For several months between May 2020 and January 2021, the NYPD engaged in a pattern and practice of using violence against protestors that was encouraged, sanctioned and enforced by Defendant City and policymaking officials.

76.   On June 17, 18, and 22 of 2020, New York State Attorney General Letitia James held hearings about the New York City Police Department's Response to Demonstrations wherein she found police officers "using excessive force against protesters, including use of batons and indiscriminate use of pepper, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[21]

77.   The Department of Investigation ("DOI") also conducted its own investigation and issued a report in response to the NYPD's response to the racial justice protest. [22]

78.   The DOI's review of NYPD policies revealed that the NYPD did not have a policy specific to policing protests or First Amendment-protected expression. Rather, the NYPD Patrol Guide covers demonstrations in policies related to policing of "special events," such as

---

[21] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020) https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf
[22] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020) https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf

parades; "emergency incidents," such as civil disorder; or "unusual disorder," such as riots.[23]

79.    The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity." [24]

80.    Just one example of many instances of excessive use of the police was highlighted by Human Rights Watch and SITU Research, [25] a 99-page report providing a detailed account of the NYPD's response to the June 4 peaceful protest in Mott Haven—a low-income neighborhood populated mostly by minorities, that has experienced high levels of police brutality and ingrained systemic racism.[26]

81.    On June 4, 2020, thousands of police officers surrounded and trapped protesters in Mott Haven, employing a tactic known as "kettling." Officers then beat kettled protestors with their batons and used pepper spray on them before arresting over 250 peaceful protestors. This was the same tactic used in each protest attended by each Plaintiff named herein.

82.    Further reports and videos taken at that protest event show countless injuries sustained at the hands of law enforcement, including broken bones, sprained muscles and joints, and potential nerve damage due to overly tight zip ties.

83.    The HRW report further notes that, "Most of those injured did not receive any immediate medical care, as police arrested or obstructed volunteer medics in medical scrubs with red

---

[23] Id at 35.
[24] Id at 56.
[25] US: New York Police Planned Assault on Bronx Protesters - *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System.* See https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters#
[26] **"Kettling" Protestors in the Bronx** – *Systemic Police Brutality and its Costs in the United States.* See https://www.hrw.org/sites/default/files/media_2020/10/us_mott%20haven0920_web.pdf

cross insignia. Dozens of people spent hours in detention with untreated wounds and their hands bound behind their backs."[27]

84. Indeed, the NYPD has responded to protests by using unlawful force and false arrests as a matter of policy and practice and has done so on many occasions throughout the years as issues of police brutality rose to unconscionable levels.

85. *The People of the State of New York v. Cityo Of New York et al*, 21-cv-322 (CM)(GWG); *Rolon et al. v. City of New York, et al.,* 21-cv-02548(CM); *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG) and *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG) resulted in a settlement promising substantial reforms to the NYPD's policing of first amendment activities including training, practices, and supervision.[28]

86. Yet, even on the heels of a settlement promising sweeping changes to police tactics related to policing demonstrations arising from the use of excessive force and other abusive tactics during the Black Lives Matter protests in the summer of 2020 and in 2021, the NYPD has continued to engage in actions related to policing pro-Palestine demonstrations such as the one at which Plaintiff was arrested, violating Plaintiffs' constitutional and other rights.

**THE NYPD'S FAILURE TO TRAIN REGARDING POLICING PROTEST**

87. Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

88. In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

---

[27] **US: New York Police Planned Assault on Bronx Protesters -** *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System.* See https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters#

[28] https://www.nyclu.org/uploads/2023/09/1099-2_settlement_agreement.pdf

In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

89.    Upon information and belief, to this day, that document forms the core of the NYPD protest response-related training.

90.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro- active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

91.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

92.    These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Plaintiff in this case.

93.    Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

94.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

95.    On information and belief, there was, and is, virtually no NYPD training—and certainly no meaningful NYPD training—focusing on how to utilize the tactics described in the

Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

96.    Defendants' failures to train, which led to violations of Plaintiff's rights in this case, include, inter alia, the following:

    a.   The failure to train, instruct, and discipline officers to discourage and prevent misconduct and assault by NYPD members;

    b.   The failure to make clear the need to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

    c.   The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies; and

    d.   The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters.

    e.   Failure to ensure police response to protest and other protected activities are not based on the content thereof.

97.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

98.    The SRG was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

99.    The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

100.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[29]

101.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the George Floyd protests, and in pro-Palestine protests around the city.[30] [31]

102.    Many SRG members, including those deployed to the protest in this case, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[32]

103.    SRG members are meant to have additional DCU training.

104.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

105.    However, the City of New York has admitted that many of the officers deployed to respond

---

[29] Ben Yakas, NYPD: Fine, Maybe We Won't Police Protests With Machine Guns, Gothamist, Jan. 30, 2015, available at https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.
[30] Council on American-Islamic Relations, CAIR-NY Calls on New York City Council to Disband the NYPD SRG, Invest in Community Programs Instead, Mar 21, 2024, available at https://www.cair-ny.org/news/2024/3/21/cair-ny-calls-on-new-york-city-council-to-disband-the-nypd-srg-invest-in-community-programs-instead (reporting that from January 2024 to March 2024, the SRG been deployed to 205 peaceful protests since January, most of which were pro-Palestine protests).
[31] The New York Civil Liberties Unit, ACLU of New York, NYCLU on NYPD Violence at Pro-Palestine Protest in Bay Ridge, May 19, 2024, available at https://www.nyclu.org/press-release/nyclu-on-nypd-violence-at-pro-palestine-protest-in-bay-ridge.
[32] Ali Winston, NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories, The Appeal, Oct. 15, 2020, available at https://theappeal.org/nypd-srg-misconduct.

to protests did not even receive that training, which was supposedly required of them.

106.    As a result, as noted in the OCC Report, "for a majority of the officers who were

assigned to the George Floyd protests, their training on policing protest was limited to

what they had received as recruits in the Academy.[33]

107.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd

control and protest policing tactics have been on full display in the streets of New York

City; the subjects of unfavorable coverage in the media, including coverage explicitly

showing video evidence of NYPD members engaging in uses of excessive force in

connection with disperse and demoralize while policing protests; documented in

complaints to the Civilian Complaint Review Board and other agencies; as well as the

litigations discussed above, which have cost the city tens of millions of dollars in

judgments and settlements.

108.    Nevertheless, upon information and belief, at all times relevant herein, City

policymakers routinely received reports regarding arrests made in connection with First

Amendment assemblies. These internal reports include Unusual Occurrence Reports;

Mass Arrest Reports including data tracking arrestees, the length of time it took them to

go through the system, whether they were released with a summons or DAT, their

proposed arrest charges, and other information related to the status and/or dispositions of

the cases; internal critiques from supervisors and other officers involved in mass arrests

related to police actions taken in relation to an event; and/or other reports including

information arrests, use of force protest arrest processing, and/or related prosecutions.

109.    Despite the wealth of evidence of NYPD members' historic brutality against protesters,

---

[33] New York City Law Department, Corporation Counsel Report (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf at page 37.

Defendant City has ignored, and/or failed to utilize relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

110.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates both a history and a policy of disregard for the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and other, related rights of Plaintiff and other similarly injured protesters.

111.    Finally, upon information and belief, under the guise of combatting antisemitism, members of the NYPD have received protest training that is Islamophobic, Anti-Arab, and anti-Palestinian. Through this training, members of the NYPD are taught that symbols of Palestinian and Arab identity are antisemitic, and that they should prosecute them accordingly.[34]

### FIRST CLAIM FOR RELIEF

**Unlawful Seizure / False Arrest**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

112.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

---

[34] Alex Kane, "Training for NYPD Officers Categorized the Keffiyeh and Watermelon as Antisemitic Symbols," Jewish Currents, Apr 24, 2025, available at https://jewishcurrents.org/training-nypd-keffiyeh-watermelon-antisemitism-israel-palestine.

113. Defendants' seizure of the Plaintiff herein was done without any judicial warrant authorizing them to seize Plaintiff, was unreasonable, and was done without privilege or lawful justification.

114. Plaintiff did not consent and was conscious of her confinement by Defendants

115. Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

116. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

117. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force
*Pursuant to 42 U.S.C.§1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

118. Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

119. Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

120. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

121. The illegal conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### First Amendment
*Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution*

122.   Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

123.   Defendants imposed restrictions on protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in unlawfully seizing Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, in subjecting Plaintiff to Defendants' protest policing policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

124.   The Defendants' retaliatory restrictions Plaintiff complains of herein imposed upon Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment in public were themselves regulations on Plaintiff's protected conduct that:

   a.   Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or,

   b.   Were content-neutral but nonetheless lacked sufficiently narrow tailoring to serve a significant governmental interest in that the restrictions substantially burdened more protected speech and/or conduct than was necessary to serve those interests, and/or failed to adequately provide alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to

communicate effectively were threatened or limited; and/or

c. Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d. Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

125. As a result of the Defendants' acts and omissions, Plaintiff was deprived of her federal, state, and/or other legal rights; caused bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused to expend costs and expenses; and/or otherwise was damaged and injured.

126. The illegal conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## **FOURTH CLAIM FOR RELIEF**

### **First Amendment Retaliation**
***Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

127. Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

128. Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

129. Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

130. Defendants engaged in the acts and omissions complained of herein in an effort to prevent

Plaintiff from continuing to engage in such protected speech and/or conduct.

131.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

132.    Additionally, as discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of her First Amendment rights.

133.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

134.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

135.    Additionally, as discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in detaining and assaulting Plaintiff subjected Plaintiff to the violations of their First Amendment rights described elsewhere herein.

136.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

137.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Due Process
*Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the Fifth and Fourteenth Amendments to the United States Constitution*

138.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

139.    As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiff violated her Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

140.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those individual Defendants who ordered, effected, and otherwise participated in seizing Plaintiff and subjected Plaintiff to the violations of her Due Process rights described elsewhere herein.

141.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

142.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Equal Protection and Selective Enforcement
*Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the Fourteenth Amendments to the United States Constitution*

143.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

144.    As discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those individual Defendants who ordered, effected, and otherwise participated in detaining Plaintiff thus subjected Plaintiff to the above-described violations of Plaintiff's Equal Protection rights.[35]

145.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

146.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

### Municipal Liability
*Pursuant to 42 U.S.C §1983 and* Monell v. Department of Social Services, *436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution*

147.    Plaintiff realleges and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

---

[35] *See* e.g. NYCLU *supra* note 20 "The continual pattern of NYPD aggression against pro-Palestine demonstrators raises important questions about the City's disparate treatment of speakers based on their message."; *See also* CAIR-NY *supra* note 19.

148.    On May 25, 2020, Minneapolis police murdered George Floyd. Almost immediately, protests against police violence and in support of police accountability and the Black Lives Matter movement spread across the United States and the world, including here in New York City where thousands exercised their constitutional rights to protest.

149.    In the following days and weeks, at the height of the COVID-19 public health pandemic, NYPD members engaged in activities that violated the constitutional and other legal rights of individuals who were protesting police misconduct, as well as bystanders and observers.

150.    The City's and NYPD's responses to the summer 2020 Black Lives Matter protests (the "Summer 2020 Protests") were the subject of public scrutiny as they unfolded and have since given rise to substantial litigation in federal and state courts as well as investigations by the New York State Attorney General, the New York City Council, and other governmental agencies.

151.    Plaintiff incorporates by reference the facts contained in the reports that have been issued concerning Defendants' responses to the summer 2020 protests, including, *inter alia,* the reports issued by the New York State Office of the Attorney General, the New York City Office of the Corporation Counsel, and the New York City Department of Investigation.[36]

152.    Plaintiff incorporates by reference the factual allegations set forth in other federal civil rights complaints in cases filed in the United States District Court for the Southern District of New York arising from Defendants' responses to the Summer 2020 Protests that support Plaintiffs' *Monell* claims against Defendants in this case, including:

    a.    *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

---

[36] Letitia James, Attorney General, State of New York, *Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd,* available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf; Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), available at https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

b.       *People of the State of New York v. CityoOf New York et al*, 21-cv-322 (CM)(GWG);

c.       *Rolon et al. v. City of New York, et al.,* 21-cv-02548(CM);

d.       *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

e.       *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

f.       *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

g.       *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

h.       *Campbell v. City of New York,* 21-cv-04056 (AJN); and

i.       *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG).

153.   The facts as pleaded above describe the policies, practices, and customs Defendants subjected Plaintiffs to, including, but not limited to: uses of excessive force, false arrests, unlawful detentions, unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; and employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning.

154.   *The People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG); *Rolon et al. v. City of New York, et al.,* 21-cv-02548(CM); *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG) and *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG) resulted in a settlement promising substantial reforms to the NYPD's policing of first amendment activities including training, practices, and supervision.[37]

155.   All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including but not limited to Defendant JOAO Rosero, and Defendant NYPD members John and Jane Does 1-6; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute de facto policies accepted,

---

[37] https://www.nyclu.org/uploads/2023/09/1099-2_settlement_agreement.pdf

encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein; and (e) Defendant City's ratification of the actions of NYPD members involved in violating Plaintiffs' rights, including especially Defendant Rosero.

156.    As a result of the Defendants' misconduct, Plaintiff was deprived of liberty and property, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and was otherwise damaged and injured.

## EIGHTH CLAIM FOR RELIEF

### *42 U.S.C. § 1983 False Arrest and Deprivation of Freedom Claim Against the Individual Defendants*

157.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

158.    The individual Defendants willfully and intentionally seized, searched, detained, and arrested Plaintiff, and caused them to be imprisoned, without probable cause, and without a reasonable basis to believe such cause existed.

159.    Plaintiff had not been engaged in any unlawful, violent, or criminal conduct, nor was she engaged in any behavior or conduct which could reasonably be viewed as such nor a basis to justify her arrest.

160.    Regardless of the lack of sufficient legal cause, Plaintiff was arrested and detained in the Defendants' custody.

161.  In so doing, the individual Defendants falsely arrested and imprisoned Plaintiff, and thereby violated and aided and abetted in the violation of Plaintiff's rights under the Fourth Amendment of the United States Constitution.

162.  By reason thereof, the individual Defendants have violated 42 U.S.C §1983 and caused Plaintiff to suffer the deprivation of her individual liberty, the loss of the rights conferred to her under the United States Constitution, physical injuries, and mental and emotional anguish.

## NINTH CLAIM FOR RELIEF

### N.Y.C. Admin. C. §§8-801 *et seq.,* "Qualified Immunity Repeal" Claims Against All Defendants

163.  Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

164.  The New York City Administrative Code §8-803 provides as follows in relevant part:

   a.  "A covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable to the person aggrieved for legal or equitable relief or any other appropriate relief."

   b.  "The employer of a covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable, based upon the conduct of such covered individual, to the person aggrieved for legal or equitable relief or any other appropriate relief."

   c.  "A person aggrieved may make a claim pursuant to subdivision a of this section in a civil action in any court of competent jurisdiction by filing a complaint setting forth facts pertaining to the deprivation of any right created, granted or protected by section 8-802 and requesting such relief as such person aggrieved considers necessary to insure the full enjoyment of such right."

165.  Given the fact that a "covered individual" under §8-801 means "[any] employee of the

police department," the individual Defendants are all considered covered individuals. §8-801.

166. Plaintiff is a "person aggrieved" because she was (at minimum) "allegedly subjected to, or allegedly caused to be subjected to, the deprivation of a right created, granted, or protected by §8-802 by a covered individual even if the only injury allegedly suffered by such natural person is the deprivation of such right." *Id.*

167. Defendant City is liable as an employer, as set out above.

168. Defendants' uses of force against Plaintiff were unjustified, unlawful, and objectively unreasonable, considering the facts and circumstances before the Defendants.

169. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

170. Further, it is not a defense to liability under §§8-801 *et seq*. that a covered individual has qualified immunity or any other substantially equivalent immunity.

171. Thus, the Court should award both compensatory and punitive damages against all parties (including the City), an order restraining future conduct, and all reasonable fees and court expenses pursuant to §8-805 of the Administrative Code.

## TENTH CLAIM FOR RELIEF

### Violations of New York State Law
***Pursuant to the New York State Constitution and New York State Common Law***

172. Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

173. The conduct of the police officials alleged herein occurred while they were on duty and/or

in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

### Violations of the New York State Constitution

174.  Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

175.  A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

### *Respondeat Superior* Liability

176.  The conduct of the police official alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and /or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiff pursuant to the state common law doctrine of *respondeat superior.*

### Assault and Battery

177.  Defendants committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

178.  Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

179.  Defendants did thereby inflict assault and battery upon the Plaintiff.

**False Arrest, False Imprisonment, and Unreasonable Detention**

180. In performing the actions and behaviors described above, the Defendants did falsely detain Plaintiff within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiff additionally was conscious of the confinement and was confined without her consent.

**Intentional and Negligent Infliction of Emotional Distress**

181. Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

182. In performing the actions and behaviors described above, Defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff. The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to the Plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

183. As a result of the foregoing, Plaintiff was deprived of her liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

**Negligent Training and Supervision**

184. Defendant City negligently trained, supervised, and trained Defendant Rosero and the Individual Defendants.

**<u>JURY DEMAND</u>**

185. Plaintiff requests a jury trial on all issues capable of being tried and determined by a jury pursuant to Fed. R. Civ. P. 38.

## <u>DEMAND FOR JUDGMENT</u>

WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of

New York as follows:

i.      Actual and punitive damages against the individual Defendants in an amount to

be determined at trial;

ii.     Actual damages in an amount to be determined at trial against the City of New York,

and punitive damages pursuant to N.Y.C. Admin. C. § 8-805(1)(ii);

iii.    An appropriate restraining order pursuant to N.Y.C. Admin. C. § 8-805(3)

iv.     Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter*

*alia,* 42

U.S.C. § 1988, N.Y.C. Admin. L. § 8-805(2), and New York common law; and

v.      Such other relief as the Court deems just and proper.

Dated: New York, New York
        May 22, 2025

                                The Aboushi Law Firm, PLLC

                                _____
                                By: Tahanie Aboushi
                                1441 Broadway, 5th Floor
                                New York, NY 10018
                                Telephone: (212)391-8500
                                Tahanie@aboushi.com

                                **Leena Mohmoud Widdi**

                                _____/s/_____
                                1825 Foster Ave, Ste 1K
                                Brooklyn, New York 11230
                                Tel: (929) 344-7611
                                Leenawiddi.esq@gmail.com

                                *Attorneys for Plaintiff*